Council, you each have 15 minutes. The case we're hearing is the United States v. Koziol. Mr. Gunn, did you wish to reserve some time for rebuttal? Yes, Your Honor. I'm going to try to reserve three minutes. I'll try to keep track of my time. Thank you. You can see the clock on the screen, and I'll try to remind you as well when you get to the 12-minute mark. Please go ahead. All right. I'm also going to set a timer. I don't think it will be too disruptive. Your Honors, on the threat of lawsuit issue, the government, I wanted to point out, has three different hurdles to overcome. First, it has to convince Your Honors on the issue of whether a threat to file a lawsuit can ever be extortion. Second, if that can somehow be the case, it has to show there was sufficient evidence to establish the two requirements for the sham exception. Third, it has the problem that the jury instructions didn't require the jury to find the sham exception. Stepping back to the first of those, the court's order asked us to be ready to address whether affirming Mr. Koziol's conviction would create a split in the circuits. The answer is it would, and it would create a very lopsided split. There are seven circuits that have held that a threat to file a lawsuit, even when filed in bad faith and with total lack of merit, cannot be criminal extortion or extortion under the Hobbs Act. I'm just curious, is there a distinction between cases that fall under the Knorr-Pennington Doctrine versus those that are sham cases? No, Your Honor. There's two issues. One is the Knorr-Pennington Doctrine basically establishes immunity when a statute would otherwise cover conduct. The Knorr-Pennington Doctrine immunity rule doesn't go at all to whether the extortion statute covers a threat to file a lawsuit in the first place. For example, the Knorr-Pennington Doctrine was developed in the antitrust context, and there's the professional real estate investors case that I cite in my brief that talks about the sham exception. There's a very good point that I quote in my briefs that's made that even if Knorr-Pennington immunity doesn't exist, there still has to be an antitrust violation. Same thing here. Even if Knorr-Pennington immunity doesn't exist, there has to be a violation of the extortion statute, and that goes to the question of whether the extortion statute covers the threat to file a bad faith lawsuit. The Seventh Circuit held it did not, so they didn't even need to get to the question of immunity because there wasn't anything that the defendants there needed to be immune from. There's a category of lawsuits that are called sham lawsuits or threats to file. What category do you find those to fall in? I mean, what cases? Basically, all seven circuits that I'm talking about, they basically recognized or assumed for purposes of argument that the lawsuits there were sham. They used different terms. They used bad faith, meritless, groundless, but they were basically saying it doesn't matter whether there's any basis for the lawsuit. It doesn't matter whether it's even fraudulent. Four of the seven circuits had situations where there were allegations of falsified evidence, very similar to what there were allegations with respect to Mr. Kosial. In the Kim case, there were allegations that there had been false documentation of trademarks. In the Prendergast case, there were allegations of falsified affidavits, and the court held that didn't matter. The court held that the threat to file a lawsuit cannot be extortion, and it gave a number of good reasons, Your Honor. Hold on just one second. You know, a lot of the cases that you've cited are basically civil cases that arise between kind of almost semi-legitimate lawsuits, where two business parties are involved in a legal dispute. Prendergast really is about the only criminal case that you've cited that makes that holding that filing a bad faith, false lawsuit that exists, really. So I guess my question is, are there any other circuit-level cases that hold the same thing as Pendergraft that's actually the criminal case growing out of the Hobbs Act? Your Honor, Pendergast is the only criminal case, I think because I've been doing this kind of work for going on 40 years now, 35 plus. Cases like this are very rarely charged criminally, that's one thing. But to go back to, Your Honors, the distinctions that Your Honors' questions suggest, those aren't, I don't think, distinctions for two reasons. First of all, the statute, the extortion statute, the criminal extortion statute gets incorporated into the civil cases via the civil RICO statute. And the statute has to mean the same thing in a civil case as it means in a criminal case, given Your Honors' a couple citations for that proposition. Second, these were, from one perspective, they were semi-business disputes, semi-legitimate business disputes, but the courts all, at least, there were allegations that they weren't legitimate. There were allegations of falsified documents and that kind of thing, and those allegations were assumed to be true for purposes of the court's holdings. And they basically said, we don't want to, two things, they said the word wrongful is ambiguous. I mean, wrongful could mean something criminal, or it could just mean something immoral, or it could mean something in between. Okay, so Mr. Gunn, can I interrupt you for a moment? Yes. So you've reached a point that I wanted to ask you about, which is, we know what the cases from the other circuits say, and it seems to me that most of them were decided on a policy basis. We don't think that this is what the statute was intended to do. But can you articulate for us a canon of statutory interpretation that we could apply to the language of this statute to reach the results that you advocate, which is that the threat of even a sham lawsuit does not fall within the meaning of extortion in the Hobbs Act. So the cases focus on or address at least the meaning of fear and wrongfulness. And in Sosa, this court did acknowledge that wrongful could include a sham lawsuit. It didn't go the next step, but it did recognize that those words could be construed in that way. I'm looking for a way to interpret the statute faithfully as opposed to trying to draft some sort of policy preference of whatever the other circuits have done. Can you tell us how we can interpret the statute that reached the result you're advocating? Yes, Your Honor. You're dealing with an ambiguous word, actually two ambiguous words, wrongful and fear. You made the point that Sosa said it could be construed to include a sham lawsuit. I'm not actually so sure Sosa said that, but one thing that Sosa said that was very interesting, it acknowledged that it could be construed even to include just a weak lawsuit like there was in Sosa. And the court basically said, we're going to interpret it not to include that. So I think Sosa implicitly recognizes that the word wrongful, and in another case, I believe it's Joseph, I.S. Joseph, recognizes that the word fear is ambiguous. So you have ambiguous words that you need to interpret, and the rule of lenity says you lean towards at least the narrower, if not the narrowest interpreter. I thought about what wrongful could mean, and I came up with a list of about four or five different possibilities, Your Honor. It could just mean something immoral. It could mean something that violates a written rule or regulation, like a rule of ethics, a lawyer ethics, for example. It could mean something that violates a common law, a tort, like malicious prosecution. It could be something that violates an actual written statute. It could mean something criminal. So I think the principle of interpretation here is wrongful and fear are ambiguous words, and that kicks in both the rule of lenity and policy considerations like the court said here considered. I mean, you do have seven other circuits. All right, I understand that. So where do we draw the line? If you have a circumstance where a person makes a bunch of threats, says I'm going to publish all sorts of information on the internet. Oh, and by the way, I'm going to sue you. When does it become a threat of litigation that, under your interpretation, would not fall within the Hobbs Act? Well, in this case, you don't quite have to reach that question, because in this case, it was just a threat of litigation. There wasn't any of the I'm going to expose this all to the press, et cetera, et cetera. But what part of the lawsuit do you expose it to the press? Well, I mean, depending on how active the press is in going and looking and so on. The entertainer was certainly worried about that. But I think the threat would have to be I'm going to expose this to the press more explicitly. And frankly, I'm not sure that's enough. I personally think you should draw the line at something that's criminal or at least something that the law says is illegal or wrong. If not criminal, at least codified in some civil statute that makes it a civil tort. Maybe including common law torts, such as Melissa's prosecution or abuse of process. But, Mr. Gunn, your client said, or in the record, he's quoted as saying, basically, you have no remedies against me for malicious prosecution or wrongful use of civil proceedings. There are no civil remedies available to the entertainer. So is civil liability enough to stop this kind of behavior? Well, Your Honor, I think it is. But on the other side of the coin, of course, is the concern about chilling really valid plaintiffs. Imagine a small-time actress or staff person who has a valid good faith claim against a big movie mogul. And imagine her getting this threatening letter from the former head of the white-collar crimes division of the United States Attorney's Office of the Southern District of New York. And imagine her saying, oh my God, they're never going to believe me. They're going to charge me with a crime. It's a balancing. Maybe he's judgment-proof, but he's still not going to want a big judgment hanging over his head. And he knows if he files a lawsuit, there's going to be lots of counterclaims filed against him. The bottom line is... I'm going off. I think we've lost Judge Bea. Hold on. And, Judge, Mr. Gunn, you're at about two and a half minutes right now. Right. Judge Bea, can you hear us? Okay. Lanka, can you stop the clock? And then, Richard, can you help us get Judge Bea back? Yes, Judge, I'm working on it. Thank you. Hello. Please enter the number you wish to dial, followed by the pound. Hello.  Sounds like Judge is calling back in by audio only. Hello. Hello. Hello. Hello. Hello. Sorry, I was off for a while. Well, we saw you freeze, and we thought you were sitting awfully still. So then we figured out you were gone. We stopped the clock. Mr. Gunn is at 2.21 on the clock, but I think he lost about 30 seconds in that. So, Mr. Gunn, if you'd like, I'll add that time back on your rebuttal time. That would be fine, Your Honor. Okay. All right. Thank you. Did you want to continue with your argument or stop now and return to Mr. Hergay? Just one last point, Your Honor. The question, of course, is how to interpret the word wrongful. And there's nothing that says it does include a threat to file a lawsuit any more than says it doesn't. And so that's where I think the rule of lenity and the policy reasons kick in. I've got a quick question. The Supreme Court has interpreted the word wrongful to consist of using a wrongful means to achieve a wrongful objective. Is it your position that the wrongful means element is not satisfied here? Yes, Your Honor. Well, I think it's both. My position is that I don't know if that's the extortion statute specifically or not, Your Honor. I'm not sure I've seen that language in the extortion context. But it's that the word wrongful use of fear, I believe, is the language in the extortion statute, does not include this sort of threat. Why does it include this sort of threat? Because of constitutional protection? Not because of constitutional protection, Your Honor, but because of the ambiguity in the word principle of construing a criminal statute narrowly and the policy concerns that would be raised if you did apply it that the other circuits have recognized. I'm glad you cleared that up. All right, thank you, Mr. Gunn. Mr. Haragay. I'm not hearing Mr. Haragay. Neither am I. I'm not hearing him either. I'm sorry, Your Honor, I had myself on mute. Can you hear me now? Yes. Okay. Your Honors, I want to begin by addressing the court's question. Affirming the defendant's conviction in this case would not result in a circuit split. And the reason for that, Your Honors, is that this case presents starkly different facts and circumstances than all of the cases cited in the court's order and in Mr. Gunn's brief. And also because nothing in the holdings of those cases would preclude Mr. Cozio's prosecution. The differences are many. I won't go through them. Some of the most obvious ones, one of you has already pointed out, which is that these disputes, except for Pendergraft, were mainly business disputes. Also, the courts in those cases did not engage in the Knorr-Pennington-Sham exception analysis. But the main dispute is that in each one of those cases, notwithstanding some of the language including in Pendergraft, in each one of those cases, the parties were actual litigants in a court proceeding. And that's important. Because once you do that, you subject yourself to the strictures, controls, and procedures of the court. And that is why the courts had no trouble, or I guess that is why the courts were troubled in finding that the conduct that was alleged in those cases was extortion. That's not the case here. Mr. Cozio was not engaged in any actual litigation. All he was doing was sort of hanging the threat of litigation over the entertainer's head in hopes of forcing him to part with a million dollars. That was the case in Pendergraft as well where, excuse me, let me back up. In Pendergraft, where the court had some of the most sweeping language, the doctor, Dr. Pendergraft and his business associate, they actually had a quote-unquote pending legitimate lawsuit. That's what the 11th Circuit said. And the threat was, of course, a threat to amend that lawsuit. And the court said, we're not going to do that. We're not going to call that extortion because we trust the courts. We trust the procedures of the courts to separate validity from invalidity, honesty from dishonesty. Also, we have trouble saying that submitting false declarations can lead to an extortion charge because we have ways of dealing with that. And we also don't want to make people afraid to engage, to be witnesses, and to participate in judicial proceedings. Mr. Cozio wasn't participating in any judicial proceeding at all. All he was doing is hanging the threat of a lawsuit over the entertainer's head. So while extortion is the antithesis of litigation, Cozio wasn't doing litigation. In addition to that, Your Honor, the holdings of those cases would not have precluded Mr. Cozio's conviction, even in the 11th Circuit, which had the most sweeping language. And the reason we know that is because of this case, the 2018 case called Cuya, which Mr. Gunn cited in his opening brief. And in that case, you had some people making threats against the victim, saying that if you don't give us money, we are going to sue you. And you're going to be opening yourself up to significant damages. And they did also say, you know, there may be seizures they meet, there may be detentions. And the defendants in that case tried to invoke Pendergraft and say, no, Pendergraft says we cannot be prosecuted because threats of litigation are not prosecutable as Hobbs Act extortion. The 11th Circuit had no problem saying, hold on a second. What you're doing here, you don't get any cover from Pendergraft because all you're doing here is clothing your threats and legalese. And we're not going to sanction that. And it's cited to this case, United States v. Lee, where the parties in that case were actually engaged in litigation. So the policy concerns that Mr. Gunn talked about were very much in play and said, even in that case, we're not going to allow you to do the threats that you are doing. That is mail fraud and you can be prosecuted for mail fraud. In CUIA, I agree with your interpretation of it, but CUIA is an unpublished case. And as a result, carries less authority. And it is kind of just the opposite of Pendergraft. So what's your explanation for the kind of inconsistencies that exist between CUIA and Pendergraft? Well, I think, again, the litigants in CUIA, they are more like COSEAL because they were not engaged in litigation at all. All they were doing was making threats of litigation. And even if we want to talk about the other things they were doing, the seizures and detentions, that's all sort of litigation activity. That's all threats of litigation activity. And the court had no problem saying that is prosecutable as Hobbs Act extortion. And, Your Honor, even if it's unpublished, what the CUIA court did was rely on Lee. And Lee is a published decision. And just on that note, very quickly, Your Honor, if there is true litigation activities that can be punished under the criminal code, like in Lee, and also as this court noted in Sosa, in the Marbella case, and in the Living Design case, both of those cases involve true litigation activity. And the court, the Ninth Circuit, had no problem saying that's still mail fraud and you can be prosecuted under the criminal code for what you're doing, even when you're engaged in litigation activity. So you can't put, you can't just sort of put a cone around the things that Mr. Cozio was doing and say this is absolutely immune. So are you drawing a distinction between pre-litigation and threats to litigate as opposed to cases that actually get into litigation? I am, Your Honor, I am. And I think that's important. If I may, well, let me answer that question. I am, Your Honor, and that's important because none of the strictures and procedures and controls that courts have to control parties in litigation apply here. And that is something, because Mr. Cozio had never engaged in litigation. And that's something that Mr. Sosa in Sosa v. Direct TV brought up. And what the court in Sosa said, you know, he said, I don't have recourse. I'm being threatened with these pre-demand letters and I don't have recourse. I can't sue for malicious prosecution. There's no perjury because this is, there's no court proceeding or declaration. And, you know, there aren't other sort of things that I can do to protect myself. And what the Ninth Circuit said is, no, you do have something. What you have is the sham exception to the Knorr-Pennington Doctrine. And that's why the inescapable conclusion of Sosa is that if you engage in sham litigation, in sham threats of litigation, you can be prosecuted under the Hobbs Act. That's all that somebody like the entertainer in this case would have. Well, I guess the civil version of that is you can potentially bring a RICO claim saying that the threat was a predicate to a RICO lawsuit. And if that's the case, if that's the case, then you can be prosecuted under the Hobbs Act. Could you please address your opponent's position that the word wrongful in the statute is inherently ambiguous? And if it is ambiguous, do we use the canons of statutory interpretation? Which canons or do we just jump to the rule of lenity? Your Honor, it's not ambiguous. I mean, there are other courts that have, there are many courts who have reviewed the language in the Hobbs Act and found no problem. Including, by the way, the Ninth Circuit in Villalobos that says all you have to do is look at the circumstances to determine if something is wrongful. And the Second Circuit in Jackson said that when there is no plausible nexus to a claim of right, when the threat has no possible nexus to a claim of right, it is inherently wrongful. So that's the Cosby case. It seems to me that the Supreme Court in the Emmons case had no problem with talking about wrongful both as to the means and as to the objective. So if the Supreme Court doesn't have a problem of ambiguity with the word wrongful, why should we? That's exactly right, Your Honor. I don't think there is any ambiguity with the word wrongful. I think the statute is fairly clear and courts have had no problem interpreting it over the years. If I may, Your Honor, just return back because I think it's important. There's nothing in the holdings of all of the cases cited by Mr. Gunn and raised in the court order that would preclude Mr. Cosio's conviction. Pendograph is their lead case and it was the lead case that they argued in the district court as well. And the holding in Pendograph is narrow. I know the court in the order put the ellipses in the part that says threat to sue against a county government. But that's what makes that case, that's the significance of that case. That's why the court was so disinclined to call it extortion because what Dr. Pendograph and his business associate were doing was pretty clear petitioning activity. And the circumstances here are about as far away as you can get from that. But Mr. Njorge, did Pendograph turn on the Knorr-Pennington Doctrine or was it an interpretation of whether the conduct fell within the criminal activity under the Hobbs Act? It did not turn on the Knorr-Pennington Doctrine. The court didn't discuss the Knorr-Pennington Doctrine. So whether it implicates the petition clause isn't the issue. The issue is how does the court interpret the statute? Well that's right. Because even if the petition clause was at issue, we'd still have to do the sham analysis. And so are you saying that the sham analysis is different from the bad faith test or the false affidavits and that the sham analysis is not in those categories? Thank you for raising that, Your Honor. The SOSA court made clear that there is no exact definition of sham litigation. And they didn't reach that either, did they? It did not in the context of pre-suit demand letters. But what it said was that it really depends on the type of governmental entity that is involved. And where Your Honor is going, I think, is to the Cottle case in which it said, you know, depending on the circumstances, this is what a sham is. And the Cottle case, of course, is important because it involved judicial proceedings. Here, we don't even have judicial proceedings. But what it said is, in some instances, if a lawsuit is objectively basis and the motive is unlawful, that's a sham. If the conduct consists of making intentional representations to the court where the litigant is knowingly doing fraud and depriving the lawsuit of legitimacy, that's a sham. But we could even step back and say, if the standard is objective baselessness and improper purpose, then we've met that standard. You know, Mr. Gunn tries to say that there has to be some collateral purpose, but that's importing the standard from the antitrust context. But frankly, even if, I'm not saying that we need to or should import that standard in this case, but even if we did, we would be able to establish that it was a sham. Because all Mr. Cozio was doing was, you know, what the Supreme Court said in professional real estate was essentially objective baselessness plus weaponizing the threat of litigation or weaponizing litigation. And what Mr. Cozio was doing was that. The lawsuit was objectively baseless. I don't think there can be any real dispute about that. And I think there was even pretty much a concession on that. Then the next question is, was it subjectively baseless? Was it so baseless, so subjectively baseless, that the only thing that Mr. Cozio could have intended to do was weaponize the threat of litigation? And I think that the evidence at trial very much established that as well. So, Your Honor, the standard really depends on the circumstances. The court has shown that it has a lot of flexibility. But I think whatever standard, you know, we've talked about in the briefs, whether it's objective baseless and improper purpose or objective baselessness and weaponizing litigation, then Mr. Cozio has done that. And if I may, because I think it's important, Your Honor, what Judge Snyder did below, what she said is that she had no trouble finding that what Cozio was doing was abusing the litigation process. Not, or using it, but basically in an abusive way. He had no intent to go through with the lawsuit. And in fact, had he gone through with a lawsuit, his purpose of obtaining money would have been defeated. He would not have gotten it because the whole claim was so baseless. And in fact, had he done that, then he would have, as Mr. Gunn points out, subjected himself to all kinds of other potential exposure. And then what the court said, what Judge Snyder said was, moreover, the Supreme Court has noted that it is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of the conduct which violates a valid statute. In other words, litigation might implicate some First Amendment protections or some First Amendment rights, but when you're using that to do extortion, you don't get immunity. But I understand your opponent is not basing his argument on the constitutional basis. His argument is simply one of ambiguity in the statute, and the question is one of statutory interpretation. Well, he may be doing that now, but that wasn't the case in the briefs, Your Honor. He just said it now, and we can be guided by his conception. Okay. Understood. All right. So, Mr. Hargave, you are out of time. Thank you. Thank you. Mr. Gunn, we'll put two minutes on the clock for your rebuttal time. All right, Your Honor. First of all, on whether the cases extend to threats, look at the language you quote in Pendergraft which refers to threats. Look at footnote 12 in the government's brief where it concedes the other cases, quote, hold to the contrary, unquote. Pendergraft was extended to the civil context in Rainey. Let me remind the court, though, that even if the sham exception would allow prosecution under this extortion statute, you have a problem that the jury never made the findings and never received instructions to require the findings that the sham exception. There's nothing that required the jury to even find Mr. Koziel knew there was no lawsuit because it could go on the unlawful alternative. There's nothing that required it to find misuse of process. Did you preserve an objection to the instruction? We preserved an objection. I didn't try the case, of course. An objection was preserved to the inclusion of unlawful as an alternative. So an objection was preserved and it's subject to harmless air review. Whether there was a requirement that the first part of the Mr. Kozel, the first part of the exception be found. The other would be subject to plain air. And I do want to object harmless air. Let me make sure your honors understand the potential defense arguments here because this air was not harmless and it did affect substantial rights if plain air applies. There was some very strong evidence to support. Obviously, the jury didn't believe it, but maybe because they didn't have the right instructions. There was some very strong arguments to suggest that whether or not it was correct, Mr. Koziel honestly believed it was entertainer. There were letters or emails that were addressed to the entertainer's first name, Andy. There was the fact that the manager settled like that within three weeks for almost the full amount allowed and then expressly included entertainer in the release of claims. There was Mr. Koziel claiming he had video of entertainer at the premises. Why would he be making that claim if he didn't really believe it was entertainer? If it wasn't entertainer and he knew that, he'd just be setting himself for entertainer to go, whew, I know I'm protected. So there was definitely a triable case here and that made the instructional air critical. Okay, thank you, Mr. Gunn. All right, so we are out of time. Thank you, counsel, both of you for your arguments. They were helpful. Thank you for joining us by VTC this morning and we're going to adjourn. Thank you, your honors. Thank you. Thank you, gentlemen. This court for this session has adjourned.
judges: Bea, Drain, Bade